Good morning. May it please the court. I'm Daniel Kaplan. I represent the appellant Clarence Dee. I would like to reserve three minutes of my time for rebuttal. If you can believe what you read in mystery novels, a skilled assassin can do in the victim with a series of small doses of poison, none of which individually is fatal, but which cumulatively will achieve the desired effect. And if done properly, it looks as though the victim died from natural causes. This court recognized in the case of United States v. Frederick, which we cited in our opening brief, that the same thing can be done to incrementally destroy the fairness of a criminal defense. And that case of Frederick is quite similar in many respects to this case. In Frederick, this court found a series of errors, a series of instances of misconduct, none of which individually the court determined prejudiced the defendant to the extent reversal was necessary. The defendant there, as here, was accused of aggravated sexual assault on an Indian reservation. The government's case in Frederick rested crucially on the testimony of the alleged victim, which the court noted several times was quite confused and contradictory. Let me talk to you a little bit about this argument. What's the standard of review? Your Honor, in the Frederick case, the court did not declare an independent standard of review for the accused. Well, I'm not talking about Frederick. Just tell me what the standard review is. I don't see in this Court's case law with respect specifically to the cumulative effect of many errors. Haven't we got it? Don't you find any cases that say this is an abuse of discretion? When looking at individual instances, individual complained of errors, sometimes abuse of discretion is a standard. For example, not only that, but in this particular instance, considering other cases we have, the standard is considered in the context of the entire trial. Absolutely. The conduct appears likely to have affected the jury's discharge of its duty to judge the evidence fairly. Absolutely. And again, an abuse of discretion is given to the judge. I don't agree with the last part. Absolutely, I agree that when a series of... Well, have you got any case law that says it's de novo? The court, I don't see in Frederick or other cumulative error cases the court using the phrase de novo. All right. So we're really talking about four different things here. And you're saying then that because the prosecutor referred to the person, to John, as the victim, on several occasions may not be that big a deal, but that's one that you're going to come up with. The Brady evidence might not quite have been exculpatory, but added on, that's one more. I guess I'm trying to figure out, the trial judge is down there. He's listening to the situation. He knows what it's going to be. And I have a Brady violation, which I have a problem seeing whether it was exculpatory. On the other hand, I have the reference to the victim or to John as the victim, and each time the judge tried to make sure that everybody didn't suggest he was a victim before they found he was one. And then the next thing that they did is the prosecutor asked an improper question, and then, of course, we can argue about whether the defense let them come back to it or not. And then the last one is the statement about absence of testimony regarding consensual sex. Now, it seems to me that each one of these are somewhat evidentiary, all of them somewhat abuse of discretion, and now you're saying to the old trial judge, given everything that happened here, there's not, this is an abuse. And then we also, when we go over the top of that, even if it is an abuse, there's a harmless error we add to this. Your Honor, the idea of deferring to the district judge and the district judge being in the better position to have understood the circumstances when he made individual rulings generally applies. But it doesn't really apply to the cumulative error argument because in the structure of a criminal trial, there's no point in time where the district judge is able and called upon and can be called upon to say, looking at the entire course of the trial, all of the individual things that were complained of in this trial came together to deny the fairness and prejudice of the defendant. It's simply not something the district court can do or does do, and this Court can't defer to a ruling by the district judge on a cumulative error argument. But this Court Even though we have nothing that suggests, you can't name the case that suggests it's DeNovo. Well, I'll name Frederick, but I'll concede that the phrase DeNovo is not used. All right. And I think that it's important, as I said, I agree with the idea of looking at the entire course of the trial, all the evidence in the trial, and let's do that. And you have correctly named the four errors that I wanted to talk about that accumulated. Let's look at the effect, to draw out my analogy a bit, in terms of poisoning the jurors' minds that each one of these errors reasonably can be thought to have had. You didn't mention, well, I'm sure you did mention the issue of one of the two instances which the government on appeal is conceding was misconduct, which is the deliberate flouting of a pretrial ruling which related to a central component of the defense case, which was the presence of the alleged victim's semen on the blanket. There was a last 11th-hour disclosure attempt to get in an expert opinion that was going to nullify the ---- There was a question that was pretty closely related to that on direct examination. Say again? There was a question on direct examination that seemed to be pretty much the same question. The defense counsel on direct ---- by the defense ---- I'm sorry, by the prosecutor? By the defense counsel. Okay. And defense counsel, when he was crossing that expert, he asked her about whether semen is the result of orgasm and ejaculation. She said yes. And then he was ---- He specifically when I ---- He asked some of the time. He said sometimes. Sometimes. He specifically introduced the idea that it's sometimes is the result of that. I thought it was the question, what that said, sometimes. Beg your pardon? I thought the question incorporated the word sometimes. His question did. Right. And I'm saying that even ---- that undermined the idea that somehow he was opening the door to reversing the district court's pretrial ruling. But wasn't he entitled to clarify what the sometimes meant? Why it was just sometimes? No. What the prosecutor argued was, in fact, it's a sidebar. She admitted she made a mistake. The prosecutor said I should be entitled to get this opinion that's been barred in, after all, because the defense counsel tried to suggest in Cross that it only results from orgasm and ejaculation, and therefore he's directly refuting what I know my expert can say to be true. And that's simply not true. And the judge and the defense counsel both remembered it was simply not true, and so the prosecutor said, well, I'm sorry, I must have misremembered. By introducing the idea of sometimes, he was specifically not saying something which the prosecutor believed she could have had her expert refute. But even if he were, Your Honor, we've made the point, and the point is not refuted, that there's no issue of opening the door by getting into some subject matter when a specific item of testimony has been barred pretrial by the district judge because of a late disclosure under Rule 16. But just a minute. In this particular situation, I think my colleague is correct. The defense attorney said she testified believing that this testimony opened the door. Then the prosecutor asked on redirect, are there other reasons, the reason being that now we have sometimes in the record, and the defense counsel had asked the question to get to that, and immediately defense counsel objected, and they had another sidebar, and the judge sustained the objections and instructed the jury to disregard the question. Correct. And the judge said, well, I think the curative instruction is more than adequate. He did. But Frederick is an example, and another case we cited in our brief, United States v. Simtob is an example, where there were curative instructions very much like that, that the Court found did not really remove the harm, did not drain the poison from the case, looking at one error in addition to others, to the extent reversal was not required. The curative instruction is not simply a free pass. And Simtob and Frederick are both instances where that can be seen. In fact, Simtob, there were three different versions of a curative instruction. All three of them together weren't enough to actually cure the harm from the error in the Simtob case, which was similar to some of the error in this case. We also have an issue about what was effectively vouching. Your Honor referred to the use of the term victim. Six times the prosecutor used the term victim. After the judge made a specific point to the jury about here's what victim conveys, when the prosecutor says victim, it means that the defendant's guilty. It means the person really is a victim. So, therefore, he shouldn't say it. And so, therefore, if he does say it, after the judge says to the jury, this isn't the right thing to say, it doesn't seem to help the prosecutor. I disagree, Your Honor. Well, I mean, that's just, again, I wasn't there. Matter of discretion. If I'd have been there, I'd know. But I'm reading this on appeal from a record. Correct. And so are you. And so am I. But, Your Honor, looking at this record where this was repeated six times, including after the jury, in case they didn't catch it, it's been explained to them exactly what this means. The prosecutor does it two more times after that. Now, the natural inference they're going to be making in their minds is, gee, I guess the prosecutor can't stop calling this person a victim because she knows he's a victim. Or the other inference is, then this guy just can't keep calling the person a victim, and the judge has said she shouldn't, so she's incompetent, so we ought not believe anything she says. Well. And, frankly, that happens with prosecutors all the time. Yeah. She's incompetent, but what she's incompetent to stop herself from doing is saying what she knows to be true. So together with what you're saying is what I'm saying is a natural inference. Is this really your best argument? Yeah, that's what I was going to say. Is this really your best argument? You started out with it. Well, you know, I'm wondering. What is your best argument? You know, I think the most egregious error was deliberately flouting that pretrial ruling. And that was key. That was a key point. If you look at the opening statement. I found the hearsay issue kind of interesting. Hearsay is a terrific issue. There's so much. I don't know where to start, Your Honor. It resembles Frederick in that in respect to the hearsay as well. Because, again, you have the whole government case is resting on the alleged victim's testimony, which is confused and contradictory. We're not really having a dispute about that aspect of the testimony in this case. And his testimony is precisely bolstered by prior consistent statements, pure garden variety hearsay statements that come in as a completely inappropriate supposed excited utterance hours afterwards after he engages in all kinds of deliberative conduct, after he runs and walks three miles to get to the street, spends a lot of time flagging down a truck, makes deliberative. Are you suggesting there are no cases at all that would suggest that this is an excited utterance? I am. I saw none. And the government, a very skilled attorney, had opportunities to find some. And I don't think he saw any. Well, I guess so all the cases cited by the government don't help him. I think they're all very distinguished. Because, again, we're on abuse of discretion again. Your Honor, the assault on a plane case was cited in that case. Very important distinction there. The declarant acted five minutes after the sexual assault was happening. And, again, she said something immediately after the assailant approached her. The contrast between that case and this case just goes to show why there was no excited utterance here. Well, in Rivera, the defendant argued the declaration occurred one half hour after the incident and, therefore, couldn't have qualified. The Court said it did. One could go with Rivera. I don't believe there was a deliberative conduct in the interim there. But I'm not certain of that offhand. I'd like to reserve the balance of my time for rebuttal. Thank you very much. Thank you. May I please recall on behalf of the United States in this matter, I first would like to make a short comment regarding the background of this case. Counsel repeatedly has referred to this case as a false case. And that just isn't so. This is not a purely he said, he said type of case. Well, let's go to the hearsay, because that was quite a substantial piece of evidence. If it should not have come in, it was bad. So how do you justify it? There are two answers to your question, Your Honor. The first answer is that the statement was an excited utterance. If you look at the timeline, the acts occurred between 9 and 12 p.m. Once John decides to leave the house and he fights down a truck driver, and that occurs at 126 a.m. At that point, while he's waiting for the police to arrive, the defendant comes after the victim, pardon me, John, and John runs away from him, runs up to a hill to wait for the police in. We don't know how long, as I understand the timeline, what we don't know is how long he was on that hill. Well, he made the phone call at 126 a.m. The defendant, by my reading of the record as I explained in the answer in brief, then approaches John. John runs away from him, runs toward a high school in the hill by the high school and waits. Then Officer Harrison comes at 209. He arrives at 209? At 209. So it could be 15 minutes. It could be 20 minutes. We don't know. Yes. So in that circumstance where you had the initial assaults in an isolated part of the reservation, John flees the house to seek police assistance. While he's waiting for help, the defendant approaches him. The victim runs away. He's under the stress of those events all that time. So there's no question that the statements relate to a sterling event. Isn't it a typical excited utterance, you know, somebody goes running out of the house and says, you know, he's after me or he's, you know, John just murdered somebody. I mean, just exactly when the thing happens. I mean, it does seem to me that this is pushing the notion a bit far from its origin. Because it would seem to suggest that, you know, any time some terrible thing happens and you're called the police and you're waiting for the police and the police come within a reasonable period of time, that that statement is going to be an excited utterance. And that is not the usual understanding. Gary, I will agree with you that this is not a classical excited utterance. But it is usual in the sense that when we're dealing with molestation cases of children, although John's a teenager, I would still maintain that he's more immature than an adult. The lapse of time between the event and the reporting of the event is longer than you would have in a classical excited utterance. And what we have to remember here is that John told the police just as soon as he could. He was constantly looking over his shoulder because he was afraid that the defendant was around. That's proof right there that he's still under the stress of the event. When the officer asks where... The truth, I mean, there's just such a severe line drawing problem. Because the truth is that when something like that happens, you know, if somebody observes a murder, for example, presumably they're going to be very stressed out for a pretty long time. I mean, you know, hours, days. But what we're dealing with here, Your Honor, is there's 43 or 44 minutes between the calling of the 911 operator. During that time, John has to deal with being afraid of the defendant because the defendant has made an effort to approach... Maybe the strongest fact here was that the defendant came after him and he could have come after him again. Yes. So when you take all of that together, the fact that it's 43 or 44 minutes is not significant. When you examine the cases that talk about incited utterances when you're dealing with molestations, and I've cited them in my brief, the crucial point is not how long it was between the time of the assault and the time of the reporting, but was it more or less the first time that the victim could report. And that's exactly what happened here. But isn't the committee note for Federal Rule of Evidence 3 really talk about the duration of the state of the excitement? Yes, Your Honor. So what we're really offering or what we're really looking at here, as I understand it, counsel, is we're looking at, did the district judge who was in the courtroom evaluating the evidence at the time abuse his discretion in suggesting that the duration of the state of excitement continued until the police got to this victim? And the answer to that question is that no, the district judge did not abuse his discretion in admitting the evidence. But beyond that, Your Honor, is that even if, and I stress even if, the district court did abuse its discretion in admitting this evidence, the error was harmless because very similar statements came in unobjected to, to the medical examiner. All right. But then that leads us to the question of whether, even though that was not objected to, whether the medical examiner evidence was itself a hearsay problem. And that, I mean, the medical examiner was really not examining this person for either a, for a treatment purpose. She was the police medical examiner. I would disagree, Your Honor, as I explained in the brief. What the examiner does is, as part of her examination, is to see if there are any medical issues that would require John to see a doctor or go to the emergency room. I mean, you can't really separate out the examination for purposes of determining the evidence of the assault from whether John needs further medical attention. Where was this medical examiner located? Was she at the jail or was she at the police station? It was at a clinic, Your Honor, in Farmington, New Mexico. The paramedics brought John to her. So she was running a clinic that was open all night? She was on call for that time, Your Honor. She was an employee of the police? I'm sorry, Your Honor, I'm not certain who employed her, but I don't believe it was the police. I can supply a supplemental citation to the record on that point. So because there was other evidence admitted that was very similar to the evidence that the defendant takes issue with now, even if the objective to evidence shouldn't have been admitted, the error was clearly harmless. I'll just speak very briefly on the misconduct claims. Two of the alleged claims were not errors at all. Although the defendant claims there was a violation, the evidence came out, counsel thoroughly questions him about the alleged inconsistency in his statement. So there was no violation there. Although the court instructed the prosecutor not to use the word victim, the case law says that as long as the jurors understand who has the burden of proof, there is no error. When you look at all – when you look at the claims of misconduct, even taken together, there just isn't sufficient prejudice to reverse. If there are no further questions. Thank you very much. Thank you, Your Honor. We're not dealing only with the 43 minutes that elapsed between calling the police and being met by Officer Harrison. We're dealing with from the startling event to the declaration. And that begins with the event, and then he gets up, he leaves the house, he says he runs and walks. But why isn't the way to look at this that the event was essentially continuing? Because he was on the run from this person, and he knew that the person had come out after him and was around somewhere or could be around somewhere. So as far as he was concerned, the event wasn't even over. Well, Your Honor, he testified that Mr. D. saw him on the road and called out and said, I'll give you a ride home. Didn't threaten him, didn't approach him. He didn't say he got near him or touched him. He said, I don't want to. Go away. And he walked the other direction. And he claimed also that he continued to follow him. I don't recall that, but that may be the case. But he doesn't testify that there was any further continuation of the sexual conduct, even an overture. He was running. I think he said he was running part of the time. He wasn't happy. The defense was that this was a consensual sexual encounter. Mr. D.'s attitude would have been, I don't understand, you know, what's gotten into him. But obviously, he wants to go home. I'll give him a ride home. When he goes and approaches him, he says, I don't want to. Go away. And he goes the other direction. You know, that was the defense. No, he didn't go away. That was the evidence that he didn't go away, that he continued to follow him. I meant that the alleged victim went away, went the other direction. But, Your Honor, Judge Breslin, you referred to the line-drawing problem. We cited the McCormick Treatise in our brief with respect to how to address the line-drawing problem. And the doctrine is, a useful rule of thumb, is that where there's enough time between the startling event and the declaration to engage in reflective thought, it should not be admitted as an excited utterance unless there's evidence that there was no reflective thought. Here, we have multiple instances of reflective thought that take place. It's very much like the Windsor v. Hall case where this Court held it was not only wrong, but objectively unreasonable under the habeas standard in similar circumstances where the basis for getting in, getting it in, was the law enforcement agent saying, the person seemed really upset when she said this to me. Very similar circumstances to here where that was an utterly insufficient basis to get it in. What about the harmicera issue? And then we need you to sit down. But what about the harmicera contention? Your Honor, when it came in through Ms. Barrett, that was utterly inappropriate as a supposed medical treatment. I certainly agree with the observation she was not a physician. She made that perfectly clear. She did not find the reason. Well, a physician can't be the reason. And that isn't what I said either. The issue wasn't that she wasn't a physician. The issue was that her function didn't seem to be to provide treatment or diagnosis. That's what I meant to say. I gather there's some evidence that it was. Yes. And her testimony was that she does a sexual assault examination. She described taking the evidence kit that the crime lab sends her, taking things out of the envelopes, taking evidence. She called it evidence multiple times, putting it into envelopes. And then the expert from the FBI said, I got this kit from the sexual assault examiner, which we then analyzed to generate evidence so I could testify against this defendant in court today. That's certainly at least part of what she was doing. But she said the other part of what she was doing was looking to see whether he needed more medical attention. She said if it appeared that he needed medical attention, she would send him back to the emergency room for doctors, for physicians who give medical treatment. She was not getting a statement to give medical treatment. She made that quite clear in her testimony. So that was a patently inappropriate way of getting that hearsay in. Thank you very much. Thank you, counsel. The case of United States v. Dee is submitted. We will take a short recess and we will be back shortly. Thank you.
judges: Noonan, Berzon, Smith